DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/24/2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,                       :

                                                           :

-against-                                        :

                                                           :

JOSHUA MEREGILDO, et al.,                        :

                  Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

11 Cr. 576 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

        Defendants Joshua Meregildo ("Meregildo") and Melvin Colon ("Colon") move separately to suppress physical property seized by the Government. Defendant Nolbert Miranda ("Miranda") moves to suppress his post-arrest statement, sever his trial, dismiss or apply the rule of lenity to Count Fifteen, and compel a bill of particulars and Brady/Giglio disclosures. This Court conducted an evidentiary hearing on the various suppression motions. For the following reasons, the Defendants' various motions are denied.

BACKGROUND

        At the evidentiary hearing, the Government called Special Agent Janice Castillo ("Castillo") of the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF"), Meregildo called no witnesses, Colon called his mother, Edilia Quian ("Quian"), and Miranda called Special Agent Patrick Collins ("Collins") of the ATF. The facts adduced at the hearing are summarized below.

    A. <u>Facts Relating to Meregildo's Suppression Motion</u>

        On March 10, 2011, Castillo and other law enforcement agents attempted to

locate and apprehend Meregildo. (Tr. 28-29.) First, Castillo and her team tried to arrest Meregildo at his home on 2253 Haviland Avenue in the Bronx. But he was not there. (Tr. 29.) Then, Castillo traveled to 3073 Park Avenue, Apt. F in the Bronx—a location where she believed Meregildo might be found. (Tr. 29-30.) Meregildo was not there either, however Castillo spoke with one of the occupants of Apt. F who provided her with a telephone number of an iPhone used by Meregildo. (Tr. 30.) Finally, Castillo and her team went to 681 Courtlandt Avenue, Apartment 5 in the Bronx (the "Courtlandt Apartment")—the home of Meregildo's wife or girlfriend. (Tr. 31.)

At the Courtlandt Apartment, Castillo learned that Meregildo was sleeping in the back bedroom. (Tr. 31.) Castillo and two other law enforcement agents received permission to enter and proceeded to a bedroom where they found Meregildo sleeping. (Tr. 32.) He was arrested. (Tr. 32.) Because Meregildo was wearing only a T-shirt and underwear, Castillo gave Meregildo a pair of pants that he identified as his own. (Tr. 32-33.) Castillo searched the pants before handing them over to Meregildo. (Tr. 33). Inside a pocket, Castillo found Meregildo's New York State identification ("NY ID") and a USB drive—a data storage device containing computer files. (Tr. 33.) Castillo also notice an iPhone and iPod Touch on top of a dresser or table in the bedroom. (Tr. 34.) Castillo seized the NY ID, USB drive, the iPhone and an iPod Touch—which she mistook for another iPhone. (Tr. 33-34.)

B. Facts Relating to Colon's Suppression Motion

On September 27, 2011, Castillo and other law enforcement agents were involved in a takedown of various defendants in this case. (Tr. 36.) Castillo learned that Colon was arrested at a co-conspirator's home. (Tr. 37.) Castillo went to 280 East 161st Street, Apartment

6U (the "161st Street Apartment"), believing it was Colon's residence. (Tr. 37-38.) On arrival Castillo spoke with Colon's mother, Edilia Quian. (Tr. 38-39.) Castillo informed Quian of Colon's arrest and asked to search the apartment. (Tr. 39-40.)

Quian responded by asking Castillo whether she had a search warrant. (Tr. 40.) When Castillo told her that she did not, Quian declined to allow a search. (Tr. 40.) Then, Castillo informed Quian that earlier in the day another defendant's parent consented to a limited search of an apartment and asked Quian if she would allow a limited search of Colon's room. (Tr. 41.) Quian agreed. (Tr. 41; Gov't Ex. 1.) Quian read an ATF consent to search form and handed it back to Castillo, who wrote "Only Melvin Colon's bedroom" on the body of it. (Tr. 42-43.) Quian then signed the form. (Tr. 42-43.) Castillo provided a copy of the signed form to Quian. (Tr. 45.) Castillo and other law enforcement agents then searched Colon's bedroom and seized letters and a pill bottle containing a "hard rock substance." (Tr. 44-45.)

Quian testified that she lived at the 161st Street Apartment but Colon did not. (Tr. 155.) According to her, she signed the consent form because Castillo told her that another agent was on his way with a search warrant. (Tr. 157-58.) And she indicated that Castillo did not add the words "Only Melvin Colon's bedroom" to her copy of the consent form. (Tr. 167-68.) Quian's copy of the consent form was not produced at the hearing.

C. Facts Relating to Miranda's Suppression Motion

On November 11, 2011, Castillo and Collins learned that Miranda was arrested by the Monticello Police Department. (Tr. 45-46.) They travelled to Monticello, New York in order to transport Miranda back to the United States Courthouse in lower Manhattan for presentment. (Tr. 46.) After taking custody of Miranda from the Monticello Police Department,

-3-

Castillo and Collins transported him by car to lower Manhattan. (Tr. 47.) During the two-hour transport, Miranda was handcuffed in the back seat of the car. (Tr. 47, 52.)

During the trip, Collins drove while Castillo asked Miranda for "pedigree" information so she could complete the required intake forms for the United States Marshals Service. (Tr. 47-48.) Miranda asked repeatedly Castillo about the charges against him. (Tr. 48.) As a result, Castillo read Miranda his Miranda rights from an ATF Miranda form. (Tr. 49-50, 100-102, 143, 146.) Miranda orally waived Miranda his rights and voluntarily spoke with Castillo regarding his sale of crack cocaine and related activities. (Tr. 49-51.)

## DISCUSSION

### I. Fourth Amendment Searches

The Fourth Amendment guarantees that all people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. A Fourth Amendment search conducted without a warrant issued upon probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." United States v. Katz, 389 U.S. 347, 357 (1967). Exceptions to the warrant requirement that are pertinent here include: (1) search incident to a lawful arrest; (2) the plain-view doctrine; and (3) a voluntary consent to a search by an authorized person.

#### A. Search of the Courtlandt Avenue Apartment

A search incident to a lawful arrest permits law enforcement to search a "lawfully arrested person and areas within his immediate control." Smith v. Ohio, 494 U.S 541, 543 (1990). These areas include places where an arrestee might gain possession of a weapon or

destructible evidence. See Chimel v. California, 395 U.S. 752, 763 (1969) (abrogated on other grounds). This exception stems from safety concerns and the need to preserve evidence. See United States v. Robinson, 414 U.S. 218, 234 (1973). "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." Robinson, 414 U.S. at 235. Moreover, "[w]hile the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence." United States v. Edwards, 415 U.S. 800, 808 (1974) (internal citation omitted).

This Court turns first to the seizure of Meregildo's New York identification and USB drive. At the time of his arrest, Meregildo was wearing only a T-shirt and underwear. (Tr. 32-33.) Law enforcement agents needed to locate appropriate clothing for him. See United States v. Di Stefano, 555 F.2d 1094, 1101 (2d Cir. 1977). Castillo fulfilled this requirement by giving Meregildo a pair of his pants that were "right next to the bed" where he sleeping when he was arrested. (Tr. 33.) Before giving Meregildo his pants, Castillo searched them. (Tr. 33.) This was a proper search incident to Meregildo's arrest. See Robinson, 414 U.S. at 234; see also Di Stefano, 555 F.2d at 1097, 1101. Accordingly, Castillo's warrantless seizure of the NY ID and the USB drive was lawful.

Next, this Court addresses the seizure of Meregildo's iPhone and iPod touch. The Government contends these items were lawfully seized incident to Meregildo's arrest. Castillo testified that Meregildo was arrested inside a small bedroom and that the iPhone and iPod touch were on top of a dresser within three feet of him. (Tr. 32-34.) Clearly, those items were within

Meregildo's immediate control and therefore properly seized incident to his arrest. See Chimel, 395 U.S. at 763; see also Robinson, 414 U.S. at 234; United States v. Curtis, 635 F.3d 704, 712-13 (5th Cir. 2011) (seizure of a cellular telephone from an area within the reaching distance of the arrestee and the search of its electronic contents upheld as a search incident to a lawful arrest).

Alternatively, the Government contends that the iPhone and iPod Touch were lawfully seized under the plain-view doctrine. The plain-view doctrine applies if (1) the officer is lawfully at the place where the evidence could be viewed; (2) the incriminating nature of the item is immediately apparent; and (3) the officer had a lawful right of access to the seized object. See Horton v. California, 496 U.S. 128, 136-37 (1990). There is no dispute that Castillo was lawfully inside the bedroom and that she had a lawful right of access to the seized object.

The incriminating nature of an item is "immediately apparent" if police have "probable cause to believe that an object in plain view is contraband without conducting some further search of the object." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). Castillo testified that:

> We had learned with our investigation that a lot of these guys were either Twittering or they were on Facebook and they were posting a lot of information that pertained to our case. When we were looking for Mr. Meregildo and this is information we received from cooperators – when we were looking for Mr. Meregildo and we found him at that location I saw the two phones and I asked him if they belonged to him. That was our interest in the phones, because we believed it [sic] had pertinent information in the phones.

(Tr. 133.) Because law enforcement suspected Meregildo's involvement in racketeering and narcotics conspiracies—whose members used cellular phones and social media to facilitate their

criminal acts—the iPhone and iPod Touch (that appeared to Government agents to be another iPhone) were immediately identifiable as evidence of criminal conduct. See United States v. Lazcano-Villalobos, 175 F.3d 838, 844 (10th Cir. 1999) ("[C]ellular telephones are recognized tools of the drug-dealing trade.")

Castillo's questioning of Meregildo to confirm his ownership of these items is irrelevant because the law looks to the objectively incriminatory nature of the item, not the subjective thoughts of the officer. See Whren v. United States, 517 U.S. 806, 814 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.") This additional information was not required because, as set forth above, the incriminatory nature of the items was immediately apparent. See Lazcano-Villalobos, 175 F.3d at 844; see also United States v. Rodriguez-Alejandro, 664 F. Supp.2d 1320, 1345 (N.D.Ga. 2009) (finding that the incriminating nature of cellular telephones was immediately apparent in a drug and wiretapping investigation). Thus, the iPhone and iPod touch were also properly seized under the plain-view doctrine.

B. Search of the 161st Street Apartment

Another exception to the warrant requirement is "a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citing Davis v. United States, 328 U.S. 582, 593-594 (1946)). In order for consent to be effective, it must "not be coerced, by explicit or implicit means, by implied threat or covert force." Schneckloth, 412 U.S. at 228. Thus, the Government must show by a preponderance of the evidence that the consent to search was voluntary. See United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006); United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004).

At the hearing, the Government established by a preponderance of the evidence that Quian consented to the search of her son's bedroom. It is undisputed that Castillo did not threaten Quian either explicitly or implicitly. Indeed, Castillo and Quian agreed in most respects regarding the circumstances surrounding the consent but disagreed on one topic—whether Castillo informed Quian that a search warrant was forthcoming. Quian testified that Castillo told her that another agent was coming with a search warrant and that she signed the form "because [she] was assuming the search warrant was on its way with the next agent." (Tr. 156-58.) In contrast, Castillo testified that she never said that to Quian. (Tr. 43.)

Quian's version of events is belied by her own testimony and her written authorization of the search. In the written authorization, Quian acknowledged that, inter alia, (1) she understood that she had a right to refuse to give consent; (2) she could demand that a search warrant be obtained prior to any search; (3) she could withdraw her consent at any time prior to its termination; and (4) her consent to search "has been given voluntarily without promises, threats, coercion or force of any kind whatsoever." (Gov't Ex. 1.) And while Quian stated that at the time she signed the form, she was emotional and upset, she acknowledged that she "read th[e] form and [] understood it. . . ." (Tr. 167.) Further, Quian's claim that Castillo gave her a contradictory ATF form that was "somewhere in the house" is just not plausible because she did not bring it to the hearing. (See Tr. 167.)

Even if this Court credited Quian's version—which it does not—the totality of the circumstances shows that her consent was the product of "an essentially free and unconstrained choice," her will was not "overborne," and her capacity for self-determination was not "critically impaired." Schneckloth, 412 U.S. at 225; see also United States v. Kon Yu-Leung, 910 F.2d 33,

41 (2d Cir. 1990). Accordingly, Quian voluntarily consented to the search of Colon's bedroom.

II. Custodial Interrogation

       Miranda moves to suppress a post-arrest statement made during the transport from Monticello to the Courthouse, claiming that he made it in violation of his Fifth and Sixth Amendment rights. Before the Government initiates a custodial interrogation,[1] it "must first apprise the suspect of the [Government's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to have 'counsel present . . . if [he] so desires.'" Moran v. Burbine, 475 U.S. 412, 420 (1986) (quoting United States v. Miranda, 384 U.S. 436, 468-70 (1966)). Once the suspect is apprised of these Constitutional rights, he may waive them "provided the waiver is made voluntarily, knowingly, and intelligently." Moran, 475 U.S. at 421.

       A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran, 475 U.S. at 421. And a waiver is knowingly and intelligently made if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran, 475 U.S at 421. "The question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." United States v. Spencer, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam) (internal quotation marks omitted).

       Castillo testified that during the trip from Monticello to the Courthouse—and prior to any custodial interrogation—Miranda asked various questions about his charges such as "What are my charges, Miss? What are my charges? What can I cop out to?" (Tr. 102-03.) Law

---

[1] Miranda was unquestionably "in custody" because at the time of the questioning he was under arrest. Thompson v. Keohane, 516 U.S. 99, 112 (1995). And Castillo's questioning was an

enforcement agents are not "prohibited from merely listening to [such] voluntary, volunteered statements and using them against him at the trial." Edwards v. Arizona, 451 U.S 477, 485 (1981). This evidence also makes clear that Miranda <u>wanted</u> to speak to Castillo.

Before responding to Miranda or interrogating him, Castillo read Miranda his <u>Miranda</u> rights from a standard ATF form. (<u>See</u> Gov't Ex. 2.) Specifically, Castillo advised Miranda that:

> (1) You have the right to remain silent;
>
> (2) Anything you say can be used against you in court;
>
> (3) You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning;
>
> (4) If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins; and
>
> (5) If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

(Gov't Ex. 2; Tr. 100-102.) Castillo read each of these rights individually to Miranda and, after each right asked him, "Do you understand?" (Tr. 101.) Each time Miranda answered "yes." (Tr. 101.) After Miranda acknowledged that he understood his rights, Castillo asked him if he wanted to talk and he replied that he did. (Tr. 100.)

An "express written or oral statement of waiver of the right to remain silent or the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." North Carolina v. Butler, 441 U.S. 369, 373 (1979). That Miranda did not sign a written waiver of his rights is not dispositive. See United States v. Munoz, 748 F.Supp. 167, 171 (S.D.N.Y. 1990) (finding oral waiver of rights was effective and

---

interrogation because it was "likely to elicit an incriminating response from [Miranda.]" Rhode Island v. Innis, 446 U.S 291, 301 (1980).

noting that "[d]efendant's refusal to sign the waiver of rights form does not automatically render the subsequent questioning improper"). The "totality of the circumstances surrounding the interrogation"—Miranda's desire prior to receiving Miranda warnings to speak with law enforcement, his clear and unequivocal responses that he understood and waived his rights, and the absence of any threats or coercion—establish that Miranda voluntary, knowingly, and intelligently waived his Miranda rights. Moran, 475 U.S. at 421; see also Farinaro v. Kirk, 675 F. Supp. 75, 80 (E.D.N.Y. 1987) (waiver of rights was valid when "petitioner was read his rights, indicated his understanding of them, and made the statements shortly thereafter").

III. Bill of Particulars and Brady/Giglio Production

        Miranda also moves to compel the Government to produce a bill of particulars for Counts Two, Fifteen, and Twenty-Eight of the Twelfth Superseding Indictment. Count Two charges Miranda with conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d). Count Fifteen charges Miranda with conspiracy to possess and distribute more than 280 grams of crack-cocaine and marijuana in violation of 21 U.S.C. §§ 841(b)(1)(A) and (b)(1)(D). And Count Twenty-Eight charges Miranda with possession of firearms in furtherance of the narcotics conspiracy charged in Count Fifteen. Among other things, Miranda requests the particulars of his alleged role in the racketeering conspiracy, the dates and locations of any meetings or conversations he participated in that furthered the conspiracies, the specific acts he undertook in furtherance of the conspiracies, the identity of co-conspirators, and the dates, locations and means by which he knowingly used and carried firearms.

        A bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f) is proper to allow a defendant "to identify with sufficient particularity the nature of the charge pending

against him, thereby enabling [him] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). A bill of particulars may be ordered to supplement an indictment that is so general that "it does not advise the defendant of the specific acts of which he is accused." United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1991), overruled on other grounds as recognized by United States v. Marcus, 628 F.3d 36, 41 (2d Cir. 2010).

The necessity of a bill of particulars depends on the nature of the charged crime. When charging conspiracy, the Government is not required to set out precisely each and every act committed by the conspirators in furtherance of the conspiracy. See United States v. Cohen, 518 F.2d 727, 733 (2d Cir. 1975). Accordingly, a bill of particulars is not properly ordered to advise a defendant of the "whens," "wheres," and "with whoms" of the charged conspiracy. See United States v. Muyet, 945 F. Supp. 586, 599 (S.D.N.Y. 1996); see also Torres, 901 F.2d at 233-34 (affirming denial of request for bill of particulars seeking the date defendant joined the conspiracy, the identities of the co-conspirators, and information relating to overt acts of the conspiracy).

Moreover, a bill of particulars is not necessary "where the government has made sufficient disclosures concerning its evidence and witnesses by other means." United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999). The Government has already provided all Rule 16 discovery. And it will provide Jencks Act material in advance of trial as previously ordered by this Court. This is more than sufficient to apprise Miranda of the essential facts. See United

States v. Salazar, 485 F.2d 1272, 1278 (2d Cir. 1973) (noting that four days is "more than adequate" to apprise of the essential facts appropriately disclosed in a bill of particulars).

Miranda moves for early disclosure of materials pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972). The Government affirms that it is not in possession of any Brady material that has not already been produced. And this Court previously ordered that the Government produce the majority of Jencks Act and Giglio material by September 20, 2012, which is more than sufficient to allow "for full exploration and exploitation by the defense." Grant v. Alldregde, 498 F.2d 376, 382 (2d Cir. 1974). Accordingly, this motion is denied as moot.

IV. Severance

Miranda seeks to sever his trial from that of his co-Defendants, Meregildo, Colon, and Earl Pierce. Federal Rule of Criminal Procedure 14(a) permits a court to order a separate trial for a defendant when a joint trial appears to prejudice him. But the "preference in the federal system for joint trials of defendants who are indicted together" is clear. Zafiro v. United States, 506 U.S. 534, 537 (1993); see Fed. R. Crim. P. 8(b). Joint trials "serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability." Richardson v. Marsh, 481 U.S. 200, 210 (1987). The presumption in favor of joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998). Because of this preference for joint trials, a court "should grant a severance motion only if there is a serious risk that a joint trial would compromise a specific trial right of the moving defendant or

prevent the jury from making a reliable judgment about guilt or innocence." United States v. Rosa, 11 F.3d 351, 341 (2d Cir. 1993).

    Miranda bears the burden of "demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial." United States v. An-Lo, 851 F.2d 547, 556 (2d Cir. 1988) (quoting United States v. Rucker, 586 F.2d 899, 902 (2d Cir. 1978)). The decision to grant or deny severance is "committed to the sound discretion of the trial court." Salameh, 152 F.3d at 115. In exercising this discretion, the Court considers the following factors: (i) the number of defendants and the number of counts; (ii) the complexity of the indictment; (iii) the estimated length of trial; (iv) disparities in the amount or type of proof offered against the defendants; (v) disparities in the degrees of involvement by defendants in the overall scheme; (vi) possible conflict between various defense or trial strategies; and (vii) prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant. See, e.g., United States v. DiNome, 954 F.2d 839, 842-45 (2d Cir. 1992); see also United States v. Santiago, 174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001); United States v. Gallo, 668 F. Supp. 736, 749 (E.D.N.Y. 1987).

    None of these factors demonstrate that Miranda will be "so severely prejudiced by a joint trial that it would in effect deny him a fair trial." United States v. An-Lo, 851 F.2d 547, 556 (2d Cir. 1988). First, although the trial of this case will involve a significant amount of evidence, it will not be complex. See United States v. Casamento, 887 F.2d 1141, 1150 (2d Cir. 1989) (giving examples of "complex cases" including "a complex antitrust case involving abstruse economic theories or an employment discrimination case involving technical statistical evidence and formulae"). Miranda's claim that he will be prejudiced based on the disparity in

relative culpability levels fails because "[d]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." United States v. Carson, 702 F.2d 351, 366-67 (2d Cir. 1983). And when evidence is admissible even when a severance would be granted—such as here because Miranda is charged with conspiracy—such evidence "is neither spillover nor prejudicial." Rosa, 11 F.3d at 341. It is also "well settled that [a defendant is] not entitled to severance merely because [he] may have a better chance of acquittal in [a] separate trial[]." Zafiro, 506 U.S at 540.

Some evidence that is not admissible against Miranda may be introduced during the trial of his co-defendants. But "the fact that evidence may be admissible against one defendant but not against another does not necessarily require a severance." United States v. Carson, 702 F.2d 351, 367 (2d Cir. 1983); see also United States v. Losada, 674 F.2d 167, 171 (2d Cir. 1982). Here, any prejudice can be counteracted by an appropriate limiting instruction. See Zafiro, 506 U.S. at 539 ("[L]ess drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.") (citing Richardson, 481 U.S. at 211); see also United States v. Potamitis, 739 F.2d 784, 790 (2d Cir. 1984) ("It is sound doctrine, to be sure, that juries must be supposed usually to be able and determined to follow instructions.") (internal citation omitted). Accordingly, Miranda's motion for severance is denied.

V. Sufficiency of Count Fifteen

Miranda moves to dismiss Count Fifteen because the indictment is not sufficiently precise to inform him of the charge he must defend against. "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or convictions in

bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974). Thus, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted).

Count Fifteen sufficiently tracks the statutory language and alleges what is required. Specifically, Count Fifteen avers that Miranda (1) conspired to "violate the narcotics laws of the United States," (2) "distribute[d] and possess[ed] with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1)," and (3) that the controlled substances involved in the offense were "280 grams and more of mixtures and substances containing a detectable amount of cocaine base, in a form commonly known as 'crack' in violation of Title 21, United States Code, Section 841(b)(1)(a)." (ECF NO. 93: S12 Indictment, ¶ 44-46.) It also alleges the time and place of the conspiracy. Thus, the indictment is sufficient. See Stavroulakis, 952 F.2d at 693.

VI. Application of the Rule of Lenity to 21 U.S.C. §841(b)(1)(C)

Miranda also moves to apply the rule of lenity to Count Fifteen because of a perceived ambiguity in the statutory provision. "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." United States v. Bass, 404 U.S 336, 347 (1971) (internal quotations omitted). "For the rule of lenity to apply, the statutory provision must be ambiguous both on its face and as applied to the particular defendant." United States v. Fields, 113 F.3d 313, 325 (2d Cir. 1997) (citation omitted).

Miranda contends that 21 U.S.C. § 841(b)(1)(A) is facially ambiguous because of a supposed conflict between the definition of "cocaine" in clause (ii)(II) and "cocaine base" in

clause (iii). Because "cocaine base" is a scientific term, this term is properly defined by its accepted meaning in the scientific community. See United States v. Jackson, 968 F.2d 158, 162 (2d Cir. 1992). In Jackson, the Second Circuit adopted an expansive definition of "cocaine base," finding that it is not only limited to "crack" cocaine. See 968 F.2d at 162. And the Supreme Court adopted the same statutory interpretation of "cocaine base" in DiPierre v. United States, 131 S.Ct. 2225, 2228 (2011).

Seizing on this expanded definition of "cocaine base," Miranda now argues that, scientifically speaking, "cocaine" and "cocaine base" are indistinguishable. This argument is no different the one advanced in Fields, that case law created a statutory ambiguity "by adopting an all-inclusive, scientific definition of cocaine base which envelops not only crack, but all other non-salt forms of cocaine." Fields, 113 F.3d at 325. In that context, the Second Circuit rejected the rule of lenity. See Fields, 113 F.3d at 325 ("[A]t a minimum, Congress planned for the higher penalties to apply to that form of cocaine known on the street and readily identified as "crack" cocaine."); see also United States v. Montoya, 87 F.3d 621, 622-23 (2d Cir. 1996) (rejecting similar argument in context of the Guidelines definitions of "cocaine and "cocaine base").

The Supreme Court rejected a similar hyper-technical semantic argument in DiPierre:

> We also recognize that our reading of "cocaine" in subclause (II) and "cocaine base" in clause (iii) to both refer to chemically basic cocaine is in tension with the usual rule that "when the legislature uses certain language in one part of the statue and different language in another, the court assumes different meanings were intended. However, because Congress sometimes uses slightly different language to convey the same message, we must be careful

-17-

not to place too much emphasis on the marginal semantic divergence between the terms "cocaine" and "cocaine base."

131 S.Ct. at 2233-34. And the Second Circuit noted in Jackson—the very case that provided this expanded definition—that "[t]he differences between cocaine base and cocaine are well enough defined to prevent arbitrary enforcement of the enhanced penalty provisions." 968 F.2d at 162. Because there is no facial ambiguity in the statutory provision, the rule of lenity does not apply.

## CONCLUSION

For the foregoing reasons, Defendant Joshua Meregildo's motion to suppress physical evidence seized from 681 Courtlandt Avenue, Apartment 5 is denied. Defendant Melvin Colon's motion to suppress physical evidence seized inside of 280-300 East 161st Street, Apartment 6U is denied. Defendant Nolbert Miranda motions to suppress his post-arrest statement, sever his trial, dismiss or apply the rule of lenity to Count Fifteen, and compel a bill of particulars and Brady/Giglio disclosures are denied.

Dated:   September 24, 2012
         New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of record.*